Good morning, Your Honors. May it please the Court, William Markham on behalf of the appellant. Good morning. Please proceed, Counsel. I believe I've fully stated our position in our papers and I'd be happy to answer any questions that the Court might have. Counsel, you've said in your brief that the language in Lucas that the District Court relied on was dicta. Correct? I believe I said so, Your Honor, in my opening papers. So explain to me how, let's say we disagree with you. Let's say that the operative, we believe that the language the District Court relied on is the holding of Lucas and not dicta. What happens to your Section 1 case then if we disagree with you that the language is this Court reconsider that holding? Because it cannot be the case that antitrust injury refers to injury that must have been caused by the antitrust violation and the conduct must be excused if it could have been caused by blameless conduct. I'm sorry. Go ahead. No, no. Why can't that be the case? Because that's not the meaning of the doctrine of antitrust injury as established by the Supreme Court. So you're saying the Lucas holding is inconsistent with Supreme Court precedent? If the District Court's interpretation of Lucas is upheld, yes. But I don't believe that's the real meaning of Lucas. Okay. Lucas was a case that went to summary judgment. There were actually two different motions for summary judgment. And in that case, the Court found that there were pro-competitive reasons for giving the exclusive contract to the defendant. And there was no evidence of super competitive prices or any restricted output, and therefore no harm to competition. And it also found that this particular competitor was not properly suited to raise the antitrust challenge. Go ahead. Go ahead. No, you already. What do you think is the best interpretation of Lucas automotive and how we analyze antitrust injury and how that applies to this case? Just help me understand Lucas automotive, which I found sort of esoteric. Thank you. Lucas automotive refers to a case in which there was no evidence after the case had already gone through all of discovery and went to summary judgment twice. There was no evidence that the challenge conduct had resulted in super competitive prices. That means prices higher than those would be charged in a competitive market and no evidence of any other kind of restricted output, such as the removal of a particular offering or less overall output. But so Lucas automotive says, look, Coker is the big dog on the block. And then when they buy this exclusive distribution right, they basically have control of the market. And the court says, well, we don't really care about that because if some small fish had bought it, you would be in the same position. So you don't have any antitrust injury. So why doesn't that apply here? Because antitrust, what antitrust injury means is established by Atlantic Richfield in Brunswick, is that if you have an antitrust violation and it incidentally causes the plaintiff injury, but the plaintiff's injury wasn't caused by an anti-competitive aspect or effect of the antitrust violation, then that plaintiff is not, has not come forward to vindicate antitrust policy. So counsel, you're essentially, it sounds to me like you're essentially saying Lucas misinterpreted Brunswick. I'm not sure that Lucas did. I don't think Lucas really turned on this issue. I think Lucas ultimately turned on it, on the court's finding after summary judgment that there were no, there was no evidence of super competitive prices or any other kind of anti-competitive harm. And there was evidence of pro-competitive reasons to give the exclusive license to Coker. Well, let's say that we might agree with you that Lucas misinterpreted Brunswick, which came obviously before it. Aren't we as a panel still stuck with Lucas, even if we think Lucas got it wrong? I believe that if Lucas got it wrong, then we have a conflict between the Sixth Circuit, which has examined this issue, and the Ninth Circuit. And I'm not, I defer to your honors as to whether you have authority to revisit the issue. But I submit that Lucas did not turn on this issue. Well, the language of Lucas, though, says because somebody else could have stepped into Coker's shoes, and it wouldn't have had any effect on Lucas, therefore, no antitrust injury or standing. Correct? I mean, that paragraph there. I just, I believe I've answered that question, Your Honor. I just don't think that that's ultimately what it turned on. But if I may give, I actually can give two analogies, because antitrust is So let's take a hypothetical case for breach of contract. And the allegation is that I sold rotten tomatoes to my restaurant customer. The restaurant customer cannot get a dismissal on the pleadings by saying, I'm sorry, I can, someone alleges that against me. I cannot have a dismissal in the pleadings by saying yes, but the plant, I could have delivered the tomatoes in, they could and the plaintiff might have mishandled them after receiving them. That could have been the cause of the rotten tomatoes. Therefore, there's no possible case. Counsel, let me move to a different issue. You alleged in the second amended complaint that it was the contractual foreclosure of competition and not the award to AFS, which caused the harm in the antitrust injury. Correct? Yes, Your Honor. I wasn't the attorney below, but yes, those were the years when CFL had the contract. No, because my understanding is that the new shipper is charging super competitive prices and then sharing the excess profits with, uh, S. C. I. C. And moreover that, but the S. A. C. Alleges that it's the foreclosure of competition that causes the injury. And wasn't the competition foreclosed for that 50 year period? No, because there were not there before then, there were not two shippers willing and licensed to serve the island. But now there are. So, uh, your client now has the permit from the C. P. U. C. Correct? Yes. And the C. P. U. C. Has made a finding that multiple shippers could be accommodated at that port. The C. P. U. C. Has expressly stated that it prefers to have competition for shipping services, but it lacks jurisdiction over S. C. I. C. Which is a private owner of the only possible commercial landing on this island. Although before the C. P. U. C. You tried to get the, uh, the other shipper that got the certificate of public convenience and necessity disqualified. And if you had succeeded, then you would have been the only qualified shipper. My understanding is that Curtin, according to the pleadings, which we have to accept is correct, and I've not conducted an independent investigation. But my understanding is that Curtin originally was under the understanding that the C. P. U. C. Would permit only one shipper to serve the island. And ultimately, it learned that, in fact, the C. P. U. C. Encouraged competition and wanted to have more than one shipper and thereafter sought a non exclusive lease and sought to introduce competition by making deliveries at all sides with its longer ramps and by making deliveries at lower prices. Did you want to say the balance of your time? Yes, I would, Your Honor. Thank you. Thank you. Yeah. Good morning. May it please the court. Carol Silverberg on behalf of Santa Catalina Island Company at Council's table is also Al Peacock, who is here today representing Avalon Freight Services, and we're sharing time. He's reserved three minutes, and he will be handling any particular C. P. U. C. Regulatory questions the court may have. This case is ultimately about a disgruntled shipper who sought this exact exclusive lease, and after losing competition for that lease, is now attacking that agreement and claiming that under the antitrust laws, it's required to have access to the island company's private property. Is it correct that the briefing seems to indicate that the facts here are somewhat unique in that there is no practicable way right now to deliver freight to the island except through this single port? Is that correct? Those are the allegations, Your Honor, yes. Okay, and so... Do you dispute those allegations? Well, at the motion to dismiss... You have to take them as true? We have to take them as true, yes, Your Honor. So is there any pro-competitive aspect of the exclusive lease agreement between Avalon Freight and... How do you refer to them? Santa Catalina? I think I was calling them Skyco, but... Yeah, the island company is what we like to refer to them. The island company? Island company, got it. Your Honor, what you have here in terms of looking at a pro-competitive justification is you're kind of jumping ahead, because ultimately, what we need to start with is antitrust injury, and antitrust injury... Well, Counsel, you may be right that that is what we have to determine, but I'd still like to hear what your answer is to Judge Ikuda's actual question. Yes, there are pro-competitive advantages to an exclusive contract, which include reliability. We're talking about safety. You've got... You have competition that's actually gone down. We actually did have competition here. So, but for the next 10 years, there's no competition. It's just Avalon Freight, and I guess the island company also has the port. Is that correct? What's alleged is that the island company has reserved their right to use that. There are no allegations that the island company is actually doing any shipping, Your Honor. It's just Avalon Freight, then, so it's exclusive. It is the same exclusive agreement that's been in a... Not the same exclusive. It was previously exclusive, and what they've done is they've traded out one exclusive provider with another exclusive provider. So Brunswick talks about the pro-competitive effects. There, the big fish was Brunswick, but the court says, well, if they revive these bowling alleys, that will just make more competition, and so we won't hear you complain about the pro-competitive effects of some action. So I'm wondering whether there are any pro-competitive effects here, because obviously the exclusive lease forecloses any competition for the Catalina Freight shipping market. Well, it forecloses competition after, but there was competition for this particular lease. Right, well, the allegation is that there was a, it was a rigged or sham competition, so let's put the Section 2 issue aside for the moment, because right now there's, there's an exclusive lease for 10 years, and so the question is, does that fall within the Brunswick reasoning? I think it does, because, well, let me, let me step back. There's absolutely no allegations that there's actually been an impact on competition here. What you have is you do have the replacement of one exclusive dealer with another, and the Supreme Court has said the freedom to switch suppliers is close to the heart of competition. So the argument is that there's now permits to do, and the regulator has said we prefer multiple shippers. So there is a, I guess, a window for competition, which has been closed by the exclusive lease, so that's how I understand the argument to be. Well, the argument is that, what, what they're actually saying is that because they, they went out and saw the CPCN, that they have the right to use Santa Catalina Island Company's private property. And as the Supreme Court has said, that there is, that there is no obligation to deal with people under, unless there are very restrictive situations, like you have in Aspen Skiing, for example. They have asserted, what they're, what they're trying to say here is essentially they have essential facilities claim, which they don't. The court rejected that down below. Why is that not correct? I mean, it sure seems like there's only one way to bring freight into Catalina that's practicable right now. They can't do it by air, and there's no other ports. So if you want to participate in the Catalina freight shipping market, that's the only game in town. Well, the essential facilities doctrine is a narrow exception, and as this court said in Ferguson, you have to be a competitor. And here, the Island Company does not compete with Curtin at all. And what they said there is the purpose of the doctrine is to prevent a firm with monopoly power, and the Island Company has no monopoly power in what they said alleged to be... I have a question on the Section 2 claim that I'd like you to address on. With regard to the Section 2 conspiracy claim, can you help me understand the exact reason the district court dismissed the conspiracy to monopolize claim, and then tell me if you were defending the district court's decision on the grounds the district court, upon the grounds the district court relied on with regard to the conspiracy to monopolize claim? I think ultimately on the conspiracy to monopolize claim, the court said that you didn't meet the requirements of either Aspen skiing or the requirements of the essential facilities doctrine. And I don't think they even pursue either of those theories here on appeal, Your Honor. What they said was, or what they said on When you go back and look at their allegations, they don't actually assert that they are seeking a monopoly in any particular entity. There's numerous allegations in the complaint in paragraphs 90-95 that this is a joint monopoly. They say things like the Island Company slash AFS is monopoly power. And the court properly previously held that that's a joint monopoly, and that is not a viable claim under this court's precedent. Does that go to the conspiracy claim? I mean, if we read this complaint broadly, it seems to me that one could read the second amended complaint as not perfectly pleaded by any means, but as setting out a conspiracy to monopolize, especially with regard to the allegations concerning the alleged sham agreement. So why broadly looking at the complaint and the reasons the district court gave, why isn't what they have there sufficient if it's relying in part on the sham agreement to, as a conspiracy, monopolize, not with regard to a joint monopolization claim? Well, if you go back to the conspiracy to begin with, we would dispute that it was actually properly alleged. But that's not what the district court relied on, right? And that is true, that they found that is what the court said. But ultimately what the court said in its dismissal of the first amended complaint is you alleged a joint monopoly. And just as you can't have a joint monopoly, you cannot conspire to have a joint monopoly. The only party with monopoly, alleged monopoly power here, is AFS. And they only got that power after they got the lease. And in fact, it's unclear whether AFS even has any power to change its rates. Ultimately, this entire industry... But has no power to charge other than within what the California Public Utilities Commission has allowed. That is correct, your honor. And they have no ability to change those rates unless they go back to the PUC and get those rates changed. Within that range of, I think CPUC says the range of reasonable rates, or the range of rate of freedom, I guess, is what they're saying. Obviously, the AFS could charge, Avalon Brake could charge at the top of those rates. If there was competition, there could be less. I don't see how that helps. Well, I think there's two things. There's one, the entire range of rates has to be just and reasonable. And the allegations here of super competitive... You're saying there can never be super competitive rates so long as CPUC is regulating the rates. Is that your position? Yes, your honor. Even if there was competition, the rates would be at the low end of the CPUC rates. That wouldn't make a difference. No, your honor, because they've determined them fully to be just and reasonable. And these are the same rates... Does anything support that in the antitrust context so that if a regulatory agency has determined that rates are just and reasonable, then there can never be a super competitive rates? Is there any case? I don't have one on my fingertips, your honor, that I can cite to you. But in this case, Curtin actually sought these exact same rates. And although they claim they're super competitive rates, if you actually go back and read the complaint, that's all they say is they're super competitive. What we know, though, is that they're actually less than they were when CFL was the exclusive provider in the past. Previously, the CPUC set these rates at Curtin's CFL level, which we'll call X. And what they say is that the zone of rate freedom is maxed out at that level. What they allege in the complaint is that while they're charging close to the top of that level, they're actually charging less than that level, which means that rates have gone down and there is competition, your honor. I think, ultimately, your honor, I just wanted to address amendment. The court properly dismissed this case and the court gave them three opportunities to appeal. The deficiencies in this complaint were pointed out when the first amended complaint was dismissed. And they did virtually nothing to change their complaint between the first amended complaint and the second amended complaint, other than to add a few allegations regarding essential facilities, which they are not even addressing or not even pursuing here on appeal. Ultimately, there's no case that says they have a right to use Santa We cited to you the Hodges case, which is from the Sixth Circuit. And in that case, there was an exclusive agreement that prevented the plaintiff from using, it was a market share participant, and they said, look, we're foreclosed for the market. And the Sixth Circuit said, ultimately, it is not the agreement that is keeping you from the market, it's the private property owner's right to keep you from the market. And that's the same situation that we have here. Ultimately, it's not the exclusive provision, it's ultimately that they just weren't picked. And that is the classic case of the jilted competitor. All right, counsel, I'm out of time. Thank you. Good morning, Your Honors. Albert Peacock on behalf of Avalon Freight Services. I'll be brief. I believe what really distinguishes this case from all of the cases cited by the plaintiff, Curtin, is the fact that the CPUC is actively involved in overseeing and regulating my client's freight service to Avalon. They said there should be competition. So what do we do about that? They did say... And they gave an extra permit, and they said we prefer competition. And so they're promoting, they're saying that this is anti-competitive. They're not saying it's anti-competitive. They say that they prefer competition. This is a unique geographical location where that just isn't possible. But what the CPUC... Wait, wait, wait, wait. Why isn't it possible? What about the unique geographic location would prevent two shippers serving Pebbly Beach? Because as alleged in the complaint, which we have to assume is true, there is only one facility on Catalina Island to service Avalon that is suitable for that purpose. So if the island company violated antitrust laws by unreasonably entering into an exclusive lease with Avalon Freight, then multiple shippers could use it, and competition would prevail. So there's no geographic limitation. In general, we have these longer ramp things, and we can go in at times when Avalon Freight isn't using it, so they wouldn't even interfere with Avalon Freight's activities. But this goes back to the private property owner's rights to select who they're going to lease their property to. And the point of raising the CPUC is that you asked the question, is there an anti-competition result of this exclusive lease? I said, is there a pro-competitive result? Because that's what Brunswick seemed to focus on. And when Hawley, we said the Brunswick line of cases, including Lucas Automotive, only apply when there's a pro-competitive result. So I'm asking what the pro-competitive result is. And I think Ms. Silberberg answered that. But the case law also addresses where the effect is neutral. And I would suggest that at worst case scenario, the involvement, there has been no change in the service of freight to the customers in Avalon. There has been no increase in the freight rates to the customers. The only adverse effect is to the parties that lost the RFP, including Curtin Maritime. How long have the rates been the same as set by... How long has the rate range been the same as set by the California Public Utilities Commission? The rate that Avalon Freight Services is currently using was the rate set for Catalina Freight Lines in 2004. For 15 years. And as Ms. Silberberg pointed out, AFS is charging less than the rates that were charged by CFL within this zone of rates. One other point... Counsel, you've exceeded your time, so could you please wrap up? Sure. There can't be a monopoly because the CPUC controls our conduct and controls our rates. And finally... Do you have a case that supports that? Because your co-counsel did not. The cases that talk about monopoly talk about a party unilaterally having the ability to control output and rates. I'm thinking that you don't have a case on board. I don't have any with my short time at my fingertips. My final point is as to leave to amend. This is a unique case because this 12B6 motion was heard after Curtin had the full ability to conduct discovery before the CPUC, to hear testimony, to see evidence, to see the lease. They had information that a normal plaintiff wouldn't have when facing a 12B6 motion. Thank you. Thank you, counsel. Rebuttal? Thank you, your honors. First of all, as to the pro-competitive benefits of the arrangement, these issues, as put in the complaint, have been placed squarely in issue. And what Curtin is saying is we're entitled to proceed beyond the pleadings on this issue. Curtin's challenge is that if it were permitted to ship to this island, it would immediately offer lower prices and greater output by delivering at all tides and not only at high tides. Those are the allegations and we have to credit those in the pleadings and Curtin should be entitled to provide evidence to support that. Brunswick says that even though you had a merger that increased market concentration and increased the possibility of an anti-competitive outcome down the line, the plaintiff in Brunswick feared the increased competition because Brunswick was a highly solvent company that acquired a weak competitor of the plaintiff. And so the plaintiff said, there's this merger that is anti-competitive under section seven of the Sherman Act. We're harmed because there's much more powerful competitors come into the market. And the Supreme Court said, your harm is not caused by a decrease in competition, your harm is caused because you fear increased competition. That's not antitrust injury. Here we're saying that the sole owner of a property, of an island, has entered into an agreement with one shipper to give that one shipper the right to ship goods to everybody on the island. So opposing counsel says, look, it's private property. They have a right to decide who they deal with and that's not an antitrust violation in some cases. What's your response to that? Thank you, Your Honor. The entire line of cases that address exclusive dealing would say that in some cases, if you have a contract between two or more parties that give the exclusive right to serve a market to one party and it substantially closes, forecloses competition for a long period and results in anti-competitive outcomes, such as higher prices and higher, super competitive prices are prices that are higher than those that would be charged in a competitive market. And if you have an anti-competitive outcome facilitated by an exclusive dealing contract that forecloses a substantial amount of competition for a long duration, then that can be properly challenged under both Sections 1 and 2 of the Sherman Act. And that's precisely the challenge we've raised. Okay. And they also say that given that the CPUC regulates this and sets a cap on what the rates can be and all rates are just and reasonable, there can't be any super competitive pricing. What's your response to that? Thank you. Two responses. First of all, super competitive pricing doesn't refer to regulated prices. It refers to whether or not prices are significantly higher than what they would be in a competitive market, which is exactly what Curtin alleges has happened. Secondly, the defendants appear to be alluding to the doctrine of state action immunity, which says that when a state agency, when the state has clearly articulated a policy of supplanting competition with something else and actively oversees the course of dealing after having announced that clearly articulated policy, then conduct cannot, then there's an immunity from antitrust violations. But here the state agency in question, the CPC has articulated its preference for competition. So state action immunity doesn't apply. And I believe the district court ruled accordingly below. Thank you, counsel. Thank you very much. Thank you to all counsel. The case just argued is submitted for decision by the court.
judges: Rawlinson, Ikuta, Bennett